# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| JUNE W. DOUGHERTY, On Behalf of Herself and All Others Similarly Situated, | ) ) ) | Case No. |
| Plaintiff, | ) ) | <u>CLASS ACTION</u> |
| v. | ) ) ) | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE** |
| AGFEED INDUSTRIES, INC., JOHN A. STADLER, GERARD DAIGNAULT, RAYMOND M. CESCA, CLAY MARSHALL, EDWARD PAZDRO, SONYAN LI, SELINA JIN, LIANGFAN YAN, and JUNHONG XIONG, | ) ) ) ) ) ) ) | **SECURITIES EXCHANGE ACT OF 1934 AND JURY DEMAND** |
| Defendants. | ) ) | |

Plaintiff, June W. Dougherty ("Plaintiff"), alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters based upon, *inter alia,* the investigation conducted by her counsel, which included, among other things, review of: various public documents, including media reports, filings with the United States Securities and Exchange Commission (the "SEC"), as well as wire and press releases published by, and regarding, AgFeed Industries, Inc. ("AgFeed" or the "Company"). Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a federal class action on behalf of purchasers (the "Class") of the common stock of AgFeed, who purchased or otherwise acquired the Company's common stock between March 12, 2008 and September 29, 2011, inclusive (the "Class

Period"), seeking to recover damages for violations of the Securities Exchange Act of 1934 (the "Exchange Act") by the Company and certain of its officers and/or directors as specified below.

2.     AgFeed is a Nevada corporation engaged in the animal nutrition and commercial hog producing businesses in the United States and the People's Republic of China ("China") through its indirect operating subsidiaries. The Company's animal nutrition business consists of the research and development, manufacture, marketing and sale of additive premix ("premix"), concentrates and complete feed for use in the domestic animal husbandry markets, primarily for hog production in China.  AgFeed is also engaged in the hog breeding and production business in both China and the United States.

3.     Throughout the Class Period, defendants issued materially false and misleading statements, and failed to disclose material adverse facts, regarding the Company's financial condition, operations and prospects.   As alleged more specifically below, defendants knew and/or recklessly failed to disclose that: AgFeed had improperly accounted for the acquisition of certain farm assets in its hog production business that it had acquired in 2007 and 2008; it had failed to properly monitor and/or assess the creditworthiness of certain customers so that various accounts receivable were uncollectible; the Company's doubtful accounts allowances were undervalued; and the Company lacked adequate internal financial controls.

4.     As a consequence of these materially false and misleading statements, and material omissions, the price of the Company's common stock was artificially inflated throughout the Class Period.   Unbeknownst to the investing public, while

defendants were disseminating positive statements about the Company, AgFeed's positive financial results were, in part, the product of improper accounting for the acquisition of certain farm assets used in its hog production business, as well as inflated accounts receivable and undervalued allowances for doubtful accounts in its animal nutrition business.

5.     On August 2, 2011, the Company issued a press release announcing that it expected to post a loss of more than $17 million due to a $5 million increase in its bad debt reserves, from $1.9 million to $7 million, as well as a $9.2 million charge for the collection of outstanding accounts in its animal nutrition business.  In addition, the Company announced that it was withdrawing the registration statement relating to the spin-off of its animal nutrition business due to "market conditions."

6.     As a consequence of these disclosures, the price of AgFeed's stock dropped more than 32%, from a closing price of $1.99 per share on August 1, 2011, the day before the announcement, to a closing price of $1.34 per share on August 2, 2011, the day of the announcement.

7.     In its interim report, filed with the SEC on August 9, 2011 on Form 10-Q for the quarter ended June 30, 2011, AgFeed disclosed additional details concerning the true state of the Company's accounts receivable and doubtful accounts.  In the Form 10-Q, AgFeed confirmed the write-off of approximately $9.2 million in uncollectible accounts for the Company's Chinese animal nutrition business.  AgFeed also reported an additional $6.3 million of bad debt allowance.

8.     On September 29, 2011, the Company announced that its Board of Directors had established a special committee to investigate the accounting relating to

certain of the Company's Chinese farm assets used in its hog production business, as well as the validity and collectability of certain of the Company's accounts receivables relating to its animal nutrition business in China.

9. Following the September 29, 2011 announcement, the price of AgFeed common stock fell from a close of $0.65 per share on September 29, 2011, to a close of $0.52 per share on September 30, 2011. Plaintiff and the members of the Class who purchased the securities of AgFeed during the Class Period at prices artificially inflated by, and in ignorance of, defendants' materially false and misleading statements, and omissions of material fact, sustained significant damages as a consequence of the defendants' wrongful conduct as alleged herein.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated under Section 10(b) of the Exchange Act (17 C.F.R. § 240.10b-5).

11. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1331.

12. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.

13. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of

4

interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

14.     Plaintiff June W. Dougherty purchased the common stock of AgFeed at artificially inflated prices during the Class Period, as set forth in her Certification, and has been damaged thereby.

15.     Defendant AgFeed is a Nevada corporation that engages in the animal nutrition premix, concentrate, complete feeds, and commercial hog production business in the United States and China through its three principal operating units: Animal Nutrition, Hog Production, and Harvesting. AgFeed's animal nutrition business consists of the research and development, manufacture, marketing and sale of premix, concentrates and complete feed for use in the domestic animal husbandry markets, primarily for hog production in China and now operates five premix feed manufacturing facilities located in the provinces of Jiangxi, Guangxi, Shandong and Hainan and the municipality of Shanghai.  AgFeed's animal nutrition business serves hog producers throughout southeastern China through five feed mills where AgFeed produces additive premix, concentrates, and complete feed. AgFeed has exclusive distribution arrangements with nearly 1,400 independently owned retail stores and serves over 780 commercial farms. The Company's hog production business consists of two breeder hog farms and 29 meat producing hog farms located in Jiangxi, Shanghai, Hainan, Guangxi, and Fujian provinces, which are strategically located in or near the largest pork consumption areas in China. In the United States, AgFeed owns 10 sow farms in Colorado, Oklahoma and North Carolina, and operates a contract finishing system in

5

Iowa of over 200 farms.   The principal executive offices of AgFeed are located at 744 Horizon Court, Suite 350, Grand Junction, Colorado. Throughout the Class Period the principal executive offices were located at 100 Bluegrass Commons Boulevard, Suite 310, Hendersonville, Tennessee.   There were approximately 64 million outstanding shares of AgFeed common stock as of August 9, 2011.  The Company's common stock is listed on the NASDAQ Stock Market under the symbol "FEED."

16.    Defendant John A. Stadler ("Stadler") has served as the Company's Chairman of the Board of Directors ("Board") and Interim Chief Executive Officer since ("CEO") February 2011. Stadler has served as a Director of the Board since September 2010. Stadler also served as the Company's Interim President from February 2011 to March 31 , 2011.

17.    Defendant Gerard Daignault ("Daignault") has served AgFeed's Chief Operating Officer ("COO") since August 2008.  Since November 2010, Daignault also served President and Chief Executive Officer ("CEO") of AgFeed's animal nutrition business.

18.    Defendant Raymond M. Cesca ("Cesca") has served as the Company's President since April 2011.

19.    Defendant Clay Marshall ("Marshall") has served as the Company's Chief Financial Officer ("CFO") since July 15, 2011.

20.    Defendant Edward Pazdro ("Pazdro") has served AgFeed's Chief Financial Officer ("CFO") since February 2011. Pazdro is also CFO of AgFeed International Protein Technology Corp., a joint venture focusing on enhancing hog production systems for Chinese and other Pan Asian clients, and the hog division of

6

AgFeed. Pazdro served as AgFeed's Acting CFO from November 2010 to February 2011.

21. Defendant Songyan Li ("Li") has served AgFeed's Executive Chairman and Chairman of the Board of Directors (the "Board") from December 2006 to February 2011, as well as a director from October 2006 to February 2011. Li also served as AgFeed's Chief Technology Officer from April 2009 until at least August 2010. After he ended his service as Executive Chairman and Chairman of the Board, Li remained with AgFeed as Vice Chairman of the Company's hog production business.

22. Defendant Selina Jin ("Selina") has served as the Company's CFO from April 16, 2009 to November 9, 2010.

23. Defendant Liangfan Yan ("Yan") has served as the Company's CFO from 2006 to April 15, 2009. Since April 15, 2009, Defendant Yan has served as the Company's controller.

24. Defendant Junhong Xiong ("Xiong") has served as AgFeed's CEO and a Company director from November 2006 to February 2011. Xiong also held various other positions at AgFeed between November 2006 and February 2011, including Vice Chairman and President. After the end of his tenure as CEO, Xiong remained with the Company as Chairman of the animal nutrition business.

25. The Defendants identified paragraphs 16 through 24 above are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of AgFeed's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional

investors, *i.e.*, the market. Each Defendant was provided with copies of the Company's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material, non-public information available to them, each of these Defendants knew, or recklessly disregarded, that the Company improperly accounted for the acquisition of certain farm assets in 2007 and 2008, that allowances for doubtful accounts were undervalued, and that AgFeed's the accounts receivable were inflated, causing the Company to report overstated asset values and understated expenses. The Individual Defendants are liable for the false statements, and omissions of material facts, pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### A.    Materially False and Misleading Statements

26.    On March 12, 2008, the Company issued a press release announcing its financial results for year ended December 31, 2007. AgFeed reported net income of $6.6 million or $0.25 diluted earnings per share ("EPS"), and revenue of $36.16 million, compared to net income of $1.18 million or $0.07 diluted EPS and revenue of $8.59 million for the same period in the prior year.

27.    The foregoing financial results were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate

internal and financial controls. As a result of the foregoing, the Company's publicly reported Class Period financial results were materially false and misleading.

28.     On March 14, 2008, the Company filed its Form 10-K for the fiscal year ended December 31, 2007 with the SEC. In that Form 10-K, AgFeed reported the same financial results previously announced in the March 12, 2008 press release. The 10-K also reported $6.09 million in accounts receivables as of December 31, 2007. The Company also stated the following:

> *Allowance For Doubtful Accounts.* We continually monitor customer payments and maintain a reserve for estimated losses resulting from our customers' inability to make required payments. In determining the reserve, we evaluate the collectability of our accounts receivable based upon a variety of factors. In cases where we become aware of circumstances that may impair a specific customer's ability to meet its financial obligations, we record a specific allowance against amounts due. For all other customers, we recognize allowances for doubtful accounts based on our historical write-off experience in conjunction with the length of time the receivables are past due, customer creditworthiness, geographic risk and the current business environment. Actual future losses from uncollectible accounts may differ from our estimates.
>
> . . .
>
> The Company maintains reserves for potential credit losses on accounts receivable. Management reviews the composition of accounts receivable and analyzes historical bad debts, customer concentrations, customer credit worthiness, current economic trends and changes in customer payment patterns to evaluate the adequacy of these reserves.

29.     The Form 10-K was signed by Defendants Xiong, Li and Yan, among others, and, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), contained certifications signed by defendants Xiong and Yan certifying that the financial information contained in the Form 10-K was accurate, and any material changes to the Company's internal control over financial reporting had been disclosed.

30.     The foregoing financial results and certification were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls.  Furthermore, the Company did not adequately monitor the collectability of its accounts receivable, failed to specifically assess the creditworthiness of individual customers, and failed to monitor and/or maintain the adequacy of its reserves for losses on accounts receivable.

31.     On May 15, 2008, the Company issued a press release announcing its financial results for the quarter ended March 31, 2008.  AgFeed reported net income of $919,297 or $0.03 diluted EPS, and revenue of $12.2 million, compared to net income of $780,000 or $0.03 diluted EPS and revenue of $4.98 million for the same period in the prior year.

32.     The foregoing financial results were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls.

33.     On May 15, 2008, the Company also filed a Form 10-Q for the quarter ended March 31, 2008 with the SEC that was signed by Defendants Xiong and Yan.  In

that Form 10-Q, AgFeed reported quarterly financial results, including $8.07 million in accounts receivable. The Company further stated:

> The Company maintains reserves for potential credit losses on accounts receivable. Management reviews the composition of accounts receivable and analyzes historical bad debts, customer concentrations, customer credit worthiness, current economic trends and changes in customer payment patterns to evaluate the adequacy of these reserves. The allowance for doubtful debts amounted to $222,879 and $191,497 at March 31, 2008 and December 31, 2007, respectively.
>
> . . .
>
> *Allowance For Doubtful Accounts*. The Company continually monitors customer payments and maintains a reserve for estimated losses resulting from its customers' inability to make required payments. In determining the reserve, the Company evaluates the collectability of its accounts receivable based upon a variety of factors. In cases where the Company becomes aware of circumstances that may impair a specific customer's ability to meet its financial obligations, the Company records a specific allowance against amounts due. For all other customers, the Company recognizes allowances for doubtful accounts based on its historical writeoff experience in conjunction with the length of time the receivables are past due, customer creditworthiness, geographic risk and the current business environment.

34.     The Form 10-Q also contained certifications pursuant to SOX, signed by defendants Xiong and Yan, that the financial information contained in the 10-Q was accurate, and that any material changes to the Company's internal control over financial reporting had been disclosed.

35.     The foregoing financial results and certification were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls. Furthermore, the Company did not

11

adequately monitor the collectability of its accounts receivable, failed to specifically assess the creditworthiness of individual customers, and failed to monitor and/or maintain the adequacy of its reserves for losses on accounts receivable.

36.     On August 11, 2008, the Company issued a press release announcing its financial results for second quarter ended June 30, 2008, reporting net income of $3.9 million or $0.12 diluted EPS, and revenue of $35.6 million, as compared to net income of $1.5 million or $0.06 diluted EPS and revenue of $6.89 million for the same period in the prior year.

37.     The foregoing financial results were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls.

38.     On August 11, 2008, the Company also filed a Form 10-Q for the quarter ended June 30, 2008 with the SEC that was signed by Defendants Xiong and Yan.  In that Form 10-Q, AgFeed reported quarterly financial results, including $8.3 million in accounts receivable net of doubtful accounts of $235,702 and $191,497.  The Company further stated:

> The Company maintains reserves for potential credit losses on accounts receivable. Management reviews the composition of accounts receivable and analyzes historical bad debts, customer concentrations, customer credit worthiness, current economic trends and changes in customer payment patterns to evaluate the adequacy of these reserves.

Case 3:11-cv-01046   Document 1   Filed 11/01/11   Page 12 of 43 PageID #: 12

39.     The Form 10-Q also contained certifications pursuant to SOX, signed by defendants Xiong and Yan, that the financial information contained in the 10-Q was accurate, and that any material changes to the Company's internal control over financial reporting had been disclosed.

40.     The foregoing financial results and certification were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls.  Furthermore, the Company did not adequately monitor the collectability of its accounts receivable, failed to specifically assess the creditworthiness of individual customers, and failed to monitor and/or maintain the adequacy of its reserves for losses on accounts receivable.

41.     On November 13, 2008, the Company issued a press release announcing financial results for the quarter ended September 30, 2008.  AgFeed reported net income of $8.2 million or $0.24 diluted EPS, and revenue of $49.4 million, compared to net income of $2.1 million or $0.08 diluted EPS and revenue of $I1.9 million for the same period of the prior year.

42.     The foregoing financial results were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's

13

allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls.

43.     On November 14, 2008, the Company filed a Form 10-Q for the quarter ended September 30, 2008 with the SEC that was signed by Defendants Xiong and Yan. In that Form 10-Q, AgFeed reported quarterly financial results, including $10.5 million in accounts receivable net of doubtful accounts of $265,908 and $191,497.  The Company further stated:

> The Company maintains reserves for potential credit losses on accounts receivable. Management reviews the composition of accounts receivable and analyzes historical bad debts, customer concentrations, customer credit worthiness, current economic trends and changes in customer payment patterns to evaluate the adequacy of these reserves.
>
> .  .  .
>
> *Allowance For Doubtful Accounts*. The Company continually monitors customer payments and maintains a reserve for estimated losses resulting from its customers' inability to make required payments. In determining the reserve, the Company evaluates the collectability of its accounts receivable based upon a variety of factors. In cases where the Company becomes aware of circumstances that may impair a specific customer's ability to meet its financial obligations, the Company records a specific allowance against amounts due. For all other customers, the Company recognizes allowances for doubtful accounts based on its historical writeoff experience in conjunction with the length of time the receivables are past due, customer creditworthiness, geographic risk and the current business environment.

44.     The Form 10-Q also contained certifications pursuant to SOX, signed by defendants Xiong and Yan, that the financial information contained in the 10-Q was accurate, and that any material changes to the Company's internal control over financial reporting had been disclosed.

45. The foregoing financial results and certification were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls. Furthermore, the Company did not adequately monitor the collectability of its accounts receivable, failed to specifically assess the creditworthiness of individual customers, and failed to monitor and/or maintain the adequacy of its reserves for losses on accounts receivable.

46. On March 16, 2009, the Company issued a press release announcing its financial results for the fiscal year ended December 31, 2008. AgFeed reported net income of $16.95 million or $0.53 diluted EPS, and revenue of $143.66 million, compared to net income of $6.66 million or $0.25 diluted EPS and revenue of $36.16 million for the same period of the prior year.

47. The foregoing financial results were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls.

48. On March 16, 2009, the Company filed a Form 10-K for the fiscal year ended December 31, 2008 with the SEC that was signed by Defendants Xiong, Li and Yan. In that Form 10-K, AgFeed reported its annual financial results, including $9.46

million in accounts receivable net of doubtful accounts of $520,413 and $191,497. The Company further stated:

> *Allowance For Doubtful Accounts*. We continually monitor customer payments and maintain a reserve for estimated losses resulting from our customers' inability to make required payments. In determining the reserve, we evaluate the collectability of our accounts receivable based upon a variety of factors. In cases where we become aware of circumstances that may impair a specific customer's ability to meet its financial obligations, we record a specific allowance against amounts due. For all other customers, we recognize allowances for doubtful accounts based on our historical write-off experience in conjunction with the length of time the receivables are past due, customer credit worthiness, geographic risk and the current business environment. Actual future losses from uncollectible accounts may differ from our estimates.

49.     The Form 10-K also contained certifications pursuant to SOX, signed by defendants Xiong and Yan, that the financial information contained in the 10-K was accurate, and that any material changes to the Company's internal control over financial reporting had been disclosed.

50.     The foregoing financial results and certification were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls. Furthermore, the Company did not adequately monitor the collectability of its accounts receivable, failed to specifically assess the creditworthiness of individual customers, and failed to monitor and/or maintain the adequacy of its reserves for losses on accounts receivable.

51.     On May 11, 2009, the Company issued a press release announcing its financial results for the quarter ended March 31, 2009. AgFeed reported net income of $3 million or $0.08 diluted EPS, and revenue of $33.4 million, compared to net income of $919,297 or $0.03 diluted EPS and revenue of $12.2 million for the same period in the prior year.

52.     The foregoing financial results were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls.

53.     On May 11, 2009, the Company also filed a Form 10-Q for the quarter ended March 31, 2009 with the SEC that was signed by Defendants Xiong and Jin. In that Form 10-Q, AgFeed reported quarterly financial results, including $11.97 million in accounts receivable net of doubtful accounts of $282,958 and $520,413. The Company further stated:

> The Company maintains reserves for potential credit losses on accounts receivable. Management reviews the composition of accounts receivable and analyzes historical bad debts, customer concentrations, customer credit worthiness, current economic trends and changes in customer payment patterns to evaluate the adequacy of these reserves.
>
> . . .
>
> *Allowance For Doubtful Accounts*. We continually monitor customer payments and maintain a reserve for estimated losses resulting from our customers' inability to make required payments. In determining the reserve, we evaluate the collectability of our accounts receivable based upon a variety of factors. In cases where we become aware of circumstances that may impair a specific

17

> customer's ability to meet its financial obligations, we record a
> specific allowance against amounts due. For all other customers,
> we recognize allowances for doubtful accounts based on our
> historical write-off experience in conjunction with the length of
> time the receivables are past due, customer credit worthiness,
> geographic risk and the current business environment. Actual
> future losses from uncollectible accounts may differ from our
> estimates.

54.     The Form 10-Q also contained certifications pursuant to SOX, signed by defendants Xiong and Jin, that the financial information contained in the 10-Q was accurate, and that any material changes to the Company's internal control over financial reporting had been disclosed.

55.     The foregoing financial results and certification were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls.  Furthermore, the Company did not adequately monitor the collectability of its accounts receivable, failed to specifically assess the creditworthiness of individual customers, and failed to monitor and/or maintain the adequacy of its reserves for losses on accounts receivable.

56.     On August 10, 2009, the Company also filed a Form 10-Q for the quarter ended June 30, 2009 with the SEC that was signed by Defendants Xiong and Jin.  In that Form 10-Q, AgFeed reported quarterly financial results, including $14.6 million in accounts receivable.  The Company further stated:

> The Company maintains reserves for potential credit losses on
> accounts receivable. Management reviews the composition of
> accounts receivable and analyzes historical bad debts, customer
> concentrations, customer credit worthiness, current economic

18

trends and changes in customer payment patterns to evaluate the adequacy of these reserves.

. . .

*Allowance For Doubtful Accounts*. We continually monitor customer payments and maintain a reserve for estimated losses resulting from our customers' inability to make required payments. In determining the reserve, we evaluate the collectability of our accounts receivable based upon a variety of factors. In cases where we become aware of circumstances that may impair a specific customer's ability to meet its financial obligations, we record a specific allowance against amounts due. For all other customers, we recognize allowances for doubtful accounts based on our historical write-off experience in conjunction with the length of time the receivables are past due, customer credit worthiness, geographic risk and the current business environment. Actual future losses from uncollectible accounts may differ from our estimates.

57.     The Form 10-Q also contained certifications pursuant to SOX, signed by defendants Xiong and Jin, that the financial information contained in the 10-Q was accurate, and that any material changes to the Company's internal control over financial reporting had been disclosed.

58.     The foregoing financial results and certification were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls.  Furthermore, the Company did not adequately monitor the collectability of its accounts receivable, failed to specifically assess the creditworthiness of individual customers, and failed to monitor and/or maintain the adequacy of its reserves for losses on accounts receivable.

59.     On November 9, 2009, the Company filed a Form 10-Q for the quarter ended September 30, 2009 with the SEC that was signed by Defendants Xiong and Jin. In that Form 10-Q, AgFeed reported quarterly financial results, including $16.2 million in accounts receivable.  The Company further stated:

> The Company maintains reserves for potential credit losses on accounts receivable. Management reviews the composition of accounts receivable and analyzes historical bad debts, customer concentrations, customer credit worthiness, current economic trends and changes in customer payment patterns to evaluate the adequacy of these reserves.
>
> .   .   .
>
> *Allowance For Doubtful Accounts*. We continually monitor customer payments and maintain a reserve for estimated losses resulting from our customers' inability to make required payments. In determining the reserve, we evaluate the collectability of our accounts receivable based upon a variety of factors. In cases where we become aware of circumstances that may impair a specific customer's ability to meet its financial obligations, we record a specific allowance against amounts due. For all other customers, we recognize allowances for doubtful accounts based on our historical write-off experience in conjunction with the length of time the receivables are past due, customer credit worthiness, geographic risk and the current business environment. Actual future losses from uncollectible accounts may differ from our estimates.

60.     The Form 10-Q also contained certifications pursuant to SOX, signed by defendants Xiong and Jin, that the financial information contained in the 10-Q was accurate, and that any material changes to the Company's internal control over financial reporting had been disclosed.

61.     The foregoing financial results and certification were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the

Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls. Furthermore, the Company did not adequately monitor the collectability of its accounts receivable, failed to specifically assess the creditworthiness of individual customers, and failed to monitor and/or maintain the adequacy of its reserves for losses on accounts receivable.

62.     On November 10, 2009, the Company issued a press release announcing its financial results for the quarter ended September 30, 2009. AgFeed reported net income of $2.9 million or $0.07 diluted EPS, and revenue of $45.12 million, compared to net income of $8.2 million or $0.24 diluted EPS and revenue of $49.4 million for the same period the previous year.

63.     The foregoing financial results were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls.

64.     On March 8, 2010, the Company filed a Form 10-K for the fiscal year ended December 31, 2009 with the SEC that was signed by Defendants Xiong, Li and Jin. In that Form 10-K, AgFeed reported its annual financial results, including $14.4 million in accounts receivable. The Company further stated:

> *Allowance For Doubtful Accounts*. We continually monitor customer payments and maintain a reserve for estimated losses resulting from our customers' inability to make required payments. In determining the reserve, we evaluate the collectability of our accounts receivable based upon a variety of factors. In cases where we become aware of circumstances that may impair a specific

customer's ability to meet its financial obligations, we record a specific allowance against amounts due. For all other customers, we recognize allowances for doubtful accounts based on our historical write-off experience in conjunction with the length of time the receivables are past due, customer credit worthiness, geographic risk and the current business environment. Actual future losses from uncollectible accounts may differ from our estimates.

.   .   .

The Company maintains reserves for potential credit losses on accounts receivable. Management reviews the composition of accounts receivable and analyzes historical bad debts, customer concentrations, customer credit worthiness, current economic trends and changes in customer payment patterns to evaluate the adequacy of these reserves.

65.     The Form 10-K also contained certifications pursuant to SOX, signed by defendants Xiong and Jin, that the financial information contained in the 10-K was accurate, and that any material changes to the Company's internal control over financial reporting had been disclosed.

66.     The foregoing financial results and certification were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls. Furthermore, the Company did not adequately monitor the collectability of its accounts receivable, failed to specifically assess the creditworthiness of individual customers, and failed to monitor and/or maintain the adequacy of its reserves for losses on accounts receivable.

67.     On March 9, 2010, the Company issued a press release announcing record revenues for 2009 in both its hog production and animal nutrition units. The

22

press release further stated that production volumes increased by 66% in the company's hog division and 56% in the animal nutrition division.

68.     The financial results reported in the press release were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls.

69.     On May 11, 2010, the Company issued a press release announcing its financial results for the quarter ended March 31, 2010.  AgFeed reported net income of $1.07 million or $0.02 diluted EPS, and revenue of $46.5 million, compared to net income of $3 million or $0.08 diluted EPS and revenue of $33.4 million for the same period the previous year.

70.     The foregoing financial results were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls.

71.     On May 11, 2010, the Company also filed a Form 10-Q for the quarter ended March 31, 2010 with the SEC that was signed by Defendants Xiong and Jin.  In that Form 10-Q, AgFeed reported quarterly financial results, including $23 million in accounts receivable.  The Company further stated:

The Company maintains reserves for potential credit losses on accounts receivable. Management reviews the composition of accounts receivable and analyzes historical bad debts, customer concentrations, customer credit worthiness, current economic trends and changes in customer payment patterns to evaluate the adequacy of these reserves.

. . .

*Allowance For Doubtful Accounts*. We continually monitor customer payments and maintain a reserve for estimated losses resulting from our customers' inability to make required payments. In determining the reserve, we evaluate the collectability of our accounts receivable based upon a variety of factors. In cases where we become aware of circumstances that may impair a specific customer's ability to meet its financial obligations, we record a specific allowance against amounts due. For all other customers, we recognize allowances for doubtful accounts based on our historical write-off experience in conjunction with the length of time the receivables are past due, customer credit worthiness, geographic risk and the current business environment. Actual future losses from uncollectible accounts may differ from our estimates.

72.     The Form 10-Q also contained certifications pursuant to SOX, signed by defendants Xiong and Jin, that the financial information contained in the 10-Q was accurate, and that any material changes to the Company's internal control over financial reporting had been disclosed.

73.     The foregoing financial results and certification were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls.  Furthermore, the Company did not adequately monitor the collectability of its accounts receivable, failed to specifically

assess the creditworthiness of individual customers, and failed to monitor and/or maintain the adequacy of its reserves for losses on accounts receivable.

74. On August 9, 2010, the Company filed a Form 10-Q for the quarter ended September 30, 2009 with the SEC that was signed by Defendants Xiong and Jin. In that Form 10-Q, AgFeed reported quarterly financial results, including $17.4 million in accounts receivable. The Company further stated:

> The Company maintains reserves for potential credit losses on accounts receivable. Management reviews the composition of accounts receivable and analyzes historical bad debts, customer concentrations, customer credit worthiness, current economic trends and changes in customer payment patterns to evaluate the adequacy of these reserves.
>
> . . .
>
> *Allowance For Doubtful Accounts*. We continually monitor customer payments and maintain a reserve for estimated losses resulting from our customers' inability to make required payments. In determining the reserve, we evaluate the collectability of our accounts receivable based upon a variety of factors. In cases where we become aware of circumstances that may impair a specific customer's ability to meet its financial obligations, we record a specific allowance against amounts due. For all other customers, we recognize allowances for doubtful accounts based on our historical write-off experience in conjunction with the length of time the receivables are past due, customer credit worthiness, geographic risk and the current business environment. Actual future losses from uncollectible accounts may differ from our estimates.

75. The Form 10-Q also contained certifications pursuant to SOX, signed by defendants Xiong and Jin, that the financial information contained in the 10-Q was accurate, and that any material changes to the Company's internal control over financial reporting had been disclosed.

76. The foregoing financial results and certification were materially false and misleading, however, because the Company had improperly accounted for certain farm

assets it acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls. Furthermore, the Company did not adequately monitor the collectability of its accounts receivable, failed to specifically assess the creditworthiness of individual customers, and failed to monitor and/or maintain the adequacy of its reserves for losses on accounts receivable.

77. On August 10, 2010, the Company issued a press release announcing its financial results for the first two quarters ended June 30, 2010. AgFeed reported revenues of $90.5 million, a 26% increase, in the first half of 2010, compared to the same period the previous year.

78. The foregoing financial results were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls.

79. On November 9, 2010, the Company issued a press release announcing its financial results for the quarter ended September 30, 2010, reporting a net loss of $20.7 million or ($0.43) diluted EPS, and revenue of $53.6 million, compared to net income of $2.9 million or $0.07 diluted EPS and revenue of $45.12 million for the same period of the previous year.

80.     The foregoing financial results were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls.

81.     On November 9, 2010, the Company also filed a Form 10-Q for the quarter ended September 30, 2009 with the SEC that was signed by Defendants Xiong and Pazdro.  In that Form 10-Q, AgFeed reported quarterly financial results, including $20 million in accounts receivable.  The Company further stated:

> The Company maintains reserves for potential credit losses on accounts receivable. Management reviews the composition of accounts receivable and analyzes historical bad debts, customer concentrations, customer credit worthiness, current economic trends and changes in customer payment patterns to evaluate the adequacy of these reserves.
>
> . . .
>
> *Allowance For Doubtful Accounts*. We continually monitor customer payments and maintain a reserve for estimated losses resulting from our customers' inability to make required payments. In determining the reserve, we evaluate the collectability of our accounts receivable based upon a variety of factors. In cases where we become aware of circumstances that may impair a specific customer's ability to meet its financial obligations, we record a specific allowance against amounts due. For all other customers, we recognize allowances for doubtful accounts based on our historical write-off experience in conjunction with the length of time the receivables are past due, customer credit worthiness, geographic risk and the current business environment. Actual future losses from uncollectible accounts may differ from our estimates.

82.     The Form 10-Q also contained certifications pursuant to SOX, signed by defendants Xiong and Pazdro, that the financial information contained in the 10-Q was

Case 3:11-cv-01046   Document 1   Filed 11/01/11   Page 27 of 43 PageID #: 27

accurate, and that any material changes to the Company's internal control over financial reporting had been disclosed.

83.     The foregoing financial results and certification were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls. Furthermore, the Company did not adequately monitor the collectability of its accounts receivable, failed to specifically assess the creditworthiness of individual customers, and failed to monitor and/or maintain the adequacy of its reserves for losses on accounts receivable.

84.     On March 16, 2010, the Company filed a Form 10-K for the fiscal year ended December 31, 2010 with the SEC that was signed by Defendants Stadler and Pazdro. In that Form 10-K, AgFeed reported its annual financial results, including $21.9 million in accounts receivable. The Company further stated:

> *Allowance For Doubtful Accounts.* We continually monitor customer payments and maintain a reserve for estimated losses resulting from our customers' inability to make required payments. In determining the reserve, we evaluate the collectability of our accounts receivable based upon a variety of factors. In cases where we become aware of circumstances that may impair a specific customer's ability to meet its financial obligations, we record a specific allowance against amounts due. For all other customers, we recognize allowances for doubtful accounts based on our historical write-off experience in conjunction with the length of time the receivables are past due, customer credit worthiness, geographic risk and the current business environment. Actual future losses from uncollectible accounts may differ from our estimates.

.  .  .

The Company maintains reserves for potential credit losses on accounts receivable. Management reviews the composition of accounts receivable and analyzes historical bad debts, customer concentrations, customer credit worthiness, current economic trends and changes in customer payment patterns to evaluate the adequacy of these reserves.

85.     The Form 10-K also contained certifications pursuant to SOX, signed by defendants Stadler and Pazdro, that the financial information contained in the 10-K was accurate, and that any material changes to the Company's internal control over financial reporting had been disclosed.

86.     The foregoing financial results and certification were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls.  Furthermore, the Company did not adequately monitor the collectability of its accounts receivable, failed to specifically assess the creditworthiness of individual customers, and failed to monitor and/or maintain the adequacy of its reserves for losses on accounts receivable.

87.     On March 17, 2010, the Company issued a press release announcing its financial results for the year ended December 31, 2010, reporting a net loss of $42.7 million or ($0.90) diluted EPS, and revenue of $243.6 million, compared to net income of $10.35 million or $0.25 diluted EPS and revenue of $173.2 million for the previous year.

88.     The foregoing financial results were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it

acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls.

89.     On May 10, 2011, the Company issued a press release announcing its financial results for the quarter ended March 31, 2011.  AgFeed reported net loss of $1.55 million or ($0.03) diluted EPS, and revenue of $93 million, as compared to net income of $1.07 million or $0.02 diluted EPS and revenue of $46.5 million for the same period the previous year.

90.     The foregoing financial results were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls.

91.     On May 10, 2010, the Company also filed a Form 10-Q for the quarter ended March 31, 2010 with the SEC that was signed by Defendants Stadler and Pazdro. In that Form 10-Q, AgFeed reported quarterly financial results, including $28.7 million in accounts receivable.  The Company further stated:

> The Company maintains reserves for potential credit losses on accounts receivable. Management reviews the composition of accounts receivable and analyzes historical bad debts, customer concentrations, customer credit worthiness, current economic trends and changes in customer payment patterns to evaluate the adequacy of these reserves.

.  .  .

*Allowance For Doubtful Accounts*. We continually monitor customer payments and maintain a reserve for estimated losses resulting from our customers' inability to make required payments. In determining the reserve, we evaluate the collectability of our accounts receivable based upon a variety of factors. In cases where we become aware of circumstances that may impair a specific customer's ability to meet its financial obligations, we record a specific allowance against amounts due. For all other customers, we recognize allowances for doubtful accounts based on our historical write-off experience in conjunction with the length of time the receivables are past due, customer credit worthiness, geographic risk and the current business environment. Actual future losses from uncollectible accounts may differ from our estimates.

92.     The Form 10-Q also contained certifications pursuant to SOX, signed by defendants Stadler and Pazdro, that the financial information contained in the 10-Q was accurate, and that any material changes to the Company's internal control over financial reporting had been disclosed.

93.     The foregoing financial results and certification were materially false and misleading, however, because the Company had improperly accounted for certain farm assets it acquired in 2007 and 2008 which were used in its hog production business; certain of the Company's accounts receivables were invalid and uncollectible; the Company's allowances for doubtful accounts were undervalued; and the Company lacked adequate internal and financial controls. Furthermore, the Company did not adequately monitor the collectability of its accounts receivable, failed to specifically assess the creditworthiness of individual customers, and failed to monitor and/or maintain the adequacy of its reserves for losses on accounts receivable.

31

**B.**     **The Truth is Revealed**

94.     On August 2, 2011, the Company announced preliminary financial results for the quarter ended June 30, 2011. AgFeed reported:

> For the second quarter of 2011, the Company expects to report revenues of approximately $84.0 million and a net loss of approximately $17 million for the three months ended June 30, 2011. ***This loss includes an expense of $9.2 million related to the collection of outstanding accounts receivable in the Company's Chinese animal nutrition business and an additional $5.0 million of bad debt allowance to increase its bad debt provision from $1.9 million to $7.0 million.*** Accordingly, we expect accounts receivable to decrease by approximately $14.2 million. The operating pressures facing the Company's customers has led management and the board to be aggressive in establishing reserves due to concerns regarding credit quality. The Company's leadership remains committed to pursuing every available remedy to collect all amounts due. [Emphasis added.]

95.     As a result of the Company's disclosure, AgFeed's stock dropped almost 33%, to close at $1.34 per share on August 2, 2011, compared to a close of $1.99 per share on August 1, 2011. The price of the Company's stock continued to decline over the next few trading days, to close at $1.02 per share on August 8, 2011.

96.     On August 9, 2011, the Company filed a Form 10-Q with the SEC for the quarter ended June 30, 2011. In that Form 10-Q, AgFeed disclosed that its accounts receivable were $13.2 million, net of the $7 million allowance for doubtful accounts as of June 30, 2011.

97.     On September 29, 2011, after the market closed, the Company disclosed that:

> its Board of Directors has established a special committee to investigate the accounting relating to certain of the Company's Chinese farm assets (acquired during 2007 and 2008) used in its hog production business, as well as the validity and collectability of certain of the Company's accounts receivables relating to its

animal nutrition business in China and any other issues that may arise during the course of the investigation.

98.     As a result of the foregoing, the price of AgFeed common stock dropped from a close of $0.65 per share on September 29, 2011 to a close of $0.40 per share two trading days later, on October 3, 2011.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

99.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired AgFeed securities between March 12, 2008 and September 29, 2011, inclusive, seeking to pursue remedies under the Exchange Act. Excluded from the Class are the defendants and members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

100.     The members of the Class are so numerous that joinder of all members is impracticable.  As of August 9, 2011 there were approximately 64 million shares of AgFeed common stock outstanding and, throughout the Class Period, the Company's common stock was actively traded on Nasdaq in an efficient market.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by AgFeed or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

101.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

102.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

103.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented and/or omitted material facts about the business, operations, prospects and financial condition of AgFeed;

(c)     whether the price of AgFeed securities was artificially inflated during the Class Period due to the misconduct of defendant alleged herein; and

(d)     Whether the members of the Class have sustained damages as a result of defendants' wrongdoing and, if so, the proper measure of damages.

104.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of

the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

105. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

106. During the Class Period, Plaintiff and members of the Class purchased common stock of AgFeed at prices artificially inflated by defendants' material misrepresentations and/or material omissions in connection with AgFeed, its business,, operations, prospects and financial condition. Plaintiff and members of the Class, who purchased AgFeed securities in ignorance of the falsity of defendants statements cited above, were damaged thereby. The price of AgFeed common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## PRESUMPTION OF RELIANCE

107. At all relevant times, the market for AgFeed securities was an efficient market for the following reasons, among others:

(a)      AgFeed common stock was traded on Nasdaq with trading volume of in the hundreds of thousands and millions of shares throughout the Class Period;

(b)      As a regulated issuer, AgFeed filed periodic public reports with the SEC and the NASDAQ;

(c) AgFeed regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services; and

(d) AgFeed was followed by securities analysts during the Class Period which were publicly available and entered the public marketplace.

108. As a result of the foregoing, the market for AgFeed common stock promptly digested current information regarding the Company from all publicly-available sources and reflected such information in AgFeed's stock price.

## NO SAFE HARBOR

109. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of AgFeed who knew that those statements were false when made.

36

# FIRST CLAIM

### Violation of Section 10(b) Of The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

110.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

111.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase AgFeed common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

112.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for AgFeed's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

113.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about AgFeed's financial well-being, business relationships, and prospects, as specified herein.

114.     Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of AgFeed's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about AgFeed and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of AgFeed's common stock during the Class Period.

115.     The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period, and members of the Company's management team or had control thereof; (ii) the Individual Defendants, by virtue of their responsibilities and activities as senior officers and/or directors of the Company were privy to data about the Company's financial condition, its accounts receivable, the adequacy of the allowances for doubtful accounts receivable, the adequacy of the Company's internal controls, the adequacy of the Company's processes for monitoring the creditworthiness of its customers, the accounting for the Company's acquisitions, and the Company's financial reporting and (iii) the Individual Defendants were aware of the dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

116. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of supporting the artificially inflated price of AgFeed's common stock. Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether the statements cited herein were false or misleading.

117. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of AgFeed's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of AgFeed's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material, adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the other members of the Class acquired AgFeed common stock during the Class Period at artificially high prices and were damaged thereby.

118. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the truth about the Company, its financial condition, operations, and business

prospects, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their AgFeed common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

119.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

120.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM

**Violation Of Section 20(a) Of The Exchange Act Against The Individual Defendants**

121.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

122.    The Individual Defendants acted as controlling persons of AgFeed within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and awareness of the Company's operations and/or intimate knowledge of the false statements in connection with the Company, its financial condition, operations, and business prospects that were disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to information about the Company's financial condition, its accounts

receivable, the adequacy of the allowances for doubtful accounts receivable, the adequacy of the Company's internal controls, the adequacy of the Company's processes for monitoring the creditworthiness of its customers, the accounting for the Company's acquisitions, and the Company's financial reporting, and issued the statements that Plaintiff alleges were materially false and misleading, and/or shortly after these statements were issued and had the ability to cause the statements to be corrected.

123.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

124.    As set forth above, the Individual Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure and that Plaintiff is adequate to serve as a representative of the Class;

(b)    Awarding damages in favor of Plaintiff and the other Class members

41

against all defendants for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: NOVEMBER 1, 2011                **BRAMLETT LAW OFFICES**

                                       By:   s/Paul Kent Bramlett  #7387
                                             PAUL KENT BRAMLETT
                                             ROBERT P. BRAMLETT #25895
                                             2400 Crestmoor Road
                                             P. O. Box 150734
                                             Nashville, TN 37215-0734
                                             Telephone:  615.248.2828
                                             Facsimile:   866.816.4116
                                             E-mails:
                                             PKNASHLAW@aol.com
                                             Robert@BramlettLawOffices.com

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long
919 N. Market Street, Suite 980
Wilmington, DE  19801
Tel.: (302) 295-5310
Fax: (302) 654-7530
Email: sdr@rigrodskylong.com
Email: bdl@rigrodskylong.com

- and -

Timothy J. MacFall
Scott J. Farrell
585 Stewart Avenue, Suite 304
Garden City, NY  11530
Tel.: (516) 683-5316
Fax: (302) 654-7530
Email: tjm@rigrodskylong.com
Email: sjf@rigrodskylong.com

*Counsel for Plaintiff June*
*Dougherty and the Class*